# Exhibit A

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

|  |  |
|---|---|
| Chicago & Vicinity Laborers' District Council Pension Fund, et al. ) ) ) | |
| Plaintiffs, ) ) | Case No. 1:25-cv-2262 |
| v. ) ) | Judge Franklin U. Valderrama |
| ) ) | Honorable Maria Valdez |
| Joy's Union Clean Up Services, LLC, et al. ) ) | |
| Defendants. ) ) ) ) | |

**Defendants' Counterclaim Against the Funds
And Third Party Complaint Against the Union**

Defendants, Joy's Union Clean Up Services, LLC, Joy's Cleaning Services LLC, and Armando Calderon, by and through their attorneys, Molho and Associates, LLC and Allocco, Miller & Cahill, P.C., bring the following counterclaims and third party claims.

**The Parties**

1.     Chicago & Vicinity Laborers' District Council Pension Fund, Chicago & Vicinity Laborers' District Council Welfare Fund, Chicago & Vicinity Laborers' District Council Retiree Health & Welfare Fund, and Catherine Wenskus, not individually but as Administrator of the Funds, (collectively the "Funds"), are multiemployer benefit plans within the meanings of Sections 3(3) and 3(37) of ERISA. 29 U.S.C. §1002(3) and 37(A). They are established and maintained pursuant to their

1

respective Agreements and Declarations of Trust in accordance with Section 302(c)(5) of the LMRA. 29 U.S.C. § 186(c)(5). The Funds have offices and conduct business within this District.

2.      Catherine Wenskus ("Wenskus") is the Administrator of the Funds, and has been duly authorized by the Funds' Trustees to act on behalf of the Funds in the collection of employer contributions owed to the Funds and to the Construction and General District Council of Chicago and Vicinity Training Fund, and with respect to the collection by the Funds of amounts which have been or are required to be withheld from the wages of employees in payment of Union dues for transmittal to the Construction and General Laborers' District Council of Chicago and Vicinity (the "Union"). With respect to such matters, Wenskus is a fiduciary of the Funds within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

3.      The Union is a labor organization within the meaning of 29 U.S.C. §185(a). The Union, Laborers' Local Union No. 1 ("Union") and the Company entered into an Independent Construction Industry Collective Bargaining Agreement on March 16, 2017.

4.      Joy's Union Clean Up Services, LLC (hereinafter "Joy's Union Clean Up" or the "Company"), is an Illinois limited liability company. The Company does business within this District and was, at all times relevant herein, an employer within

2

the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5), and Section 301(a) of the LMRA, 29 U.S.C.

5.      Joy's Cleaning Services, LLC is a non-union Illinois limited liability company and a named defendant.

6.      Armando Calderon is the managing member of Joy's Union Clean Up and an individual who lives in Bloomingdale, IL in DuPage County.

## COUNT I
### Defendant Company's Tortious Interference with Contract
### Power Construction Company, LLC
### Against Plaintiff-Counter Defendants Funds
### and Against Third Party Defendant Union

7.      This Court has supplemental jurisdiction over this counterclaim and third-party claim pursuant to 28 U.S.C. §1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.   The state law claims arise from the same common nucleus of operative fact as the federal claims.

8.      Venue is proper pursuant 28 U.S.C. §1391 because a substantial part of the events or omissions occurred in this District.

9.      On or about January 13, 2025, the Company was party to an existing and valid contract for cleaning services with Power Construction Company, LLC. ("Power").

10.     A true and correct copy of the Company's existing and valid contract with Power is attached and incorporated herein at Exhibit 1.  The job involved post construction clean up.

11.     The value of the contract was $43,000.00 for the cleaning of five (5) floors.

12.     Both the Funds and the Union had actual knowledge that the Company had a contractual relationship with Power because upon information and belief, the Funds and the Union have been following and watching the Company's employees and workforce and generally engaging in surveillance of the Company for the past year.

13.     Upon information and belief, at approximately the same time that the Funds filed this lawsuit in March 2025, the Funds conspired with the Union to put economic pressure upon all of the Defendants, including the Company.

14.     On or about June 19, 2025, while working on the job site at Power, Armando Calderon, overheard a telephone call between the Union President John Conrad, and one of the Company's employees, Gustavo Herrera.  The crux of the phone call was John Conrad urging Gustavo Herrera to walk off the Power job because the Company was allegedly "not in good standing."

15.     On or about June 20, 2025, Gustavo Herrera quit the Power job, because of the Union instructions, and never returned.

4

16.     Upon information and belief, the Funds and the Union communicated directly with Power and threatened Power that the Funds and/or the Union would lien the Power job if Power continued to work with the Company.

17.     Upon information and belief, the Funds and the Union falsely represented to Power that the Company's payments to the Union and the Funds were in arrears or delinquent because they sought to cause Power to stop doing business with the Company – which is exactly what happened.  The Funds and the Union acted maliciously toward the Company.

18.     On June 23, 2025, Armando Calderon received a phone call from Miguel, Power's Superintendent.   Miguel said that Power had been told that the Union said that the Company was not allowed to work on the Power job site unless the Defendants resolved this litigation with the Funds.  Miguel recommended that Armando Calderon call Power employee Lance Kennedy.   Armando Calderon called Lance Kennedy and Mr. Kennedy said the Company could no longer work on the Power job site.

19.     As far as the Company is aware, Power was satisfied with all of the work performed by the Company and Power would not have breached its contract with the Company, had the Funds and the Union not intentionally interfered with the parties' contract.

5

20.    At the time that Funds and the Union actively interfered with the Company's contract with Power, the Company had cleaned three (3) of the five (5) floors associated with the Power contract and were owed $31,000.00.   At all times the Company used union employees to complete the three (3) floors.

21.    Power has never paid the Company for any of the work performed in connection with the contract.

22.    The Company has been damaged by $31,000.00, lost profits, and its attorney's fees and costs, plus punitive damages as a result of the Funds and the Union's malicious interference with their contract.

WHEREFORE, the Company respectfully requests that this Court award the Company $31,000.00 in damages, plus consequential damages, punitive damages in an amount to be determined at trial, costs of suit and any and all other relief that this Court deems appropriate under the circumstances.

## COUNT II
### Defendant Joy's Cleaning Services, LLC  Tortious Interference with Contract Against Plaintiff-Counter Defendants Funds and Against Third Party Defendant Union

23.    Joy's Cleaning Services, LLC 's incorporates and reallege the allegations in paragraphs 1-8 of this Counterclaim and Third Party Complaint as if restated herein.

24.    Joy's Cleaning Services, LLC has been cleaning Painters District Council 14 ("DC 14") offices located in Chicago since July 2022 and DC 14's offices located in

6

Berkley since September 2021.   Joy's Cleaning Services, LLC has been cleaning DC 14's  Darrien office since January 2024.

25.    Joy's Cleaning Services, LLC   average revenue earned for each DC 14 office is as follows:

    a.    Berkley – annual revenue of $55,000.00

    b.    Chicago – annual revenue of $20,000.00

    c.    Darrien – annual revenue of $10,500.00

26.    On January 24, 2025, Armando Calderon was approached by Dan Penski, a DC 14 employee.  Dan told Armando Calderon that Local 1 Union had contacted him and told him [Dan Penski] not to work with Armando Calderon or Joy's Cleaning Services, LLC  because the Defendants knowingly use illegal immigrants as labor. Dan told Armando Calderon that the Union was pressuring DC 14 because the Union did not like the fact that Armando Calderon had two companies with one company using union employees and one company using non-union employees.  Dan Penski went on to say that he liked Armando Calderon, so he wanted to give him the courtesy of notice.

27.    Moreover, during the meeting between Armando Calderon and Dan Penski, Armando witnessed three grievances from the Union on a Union official's desk alleging various misdeeds by the Defendants, including but not limited to,

Armando Calderon's alleged sexual harassment of one of the Company's employees. Jerry Williams saw the grievances as well.

28.     Both the Funds and the Union had actual knowledge that Joy's Cleaning Services, LLC had a contractual relationship with DC 14 because upon information and belief, the Funds and the Union have been following and watching Joy's Cleaning Services, LLC employees and workforce and engaging in surveillance of Joy's Cleaning Services, LLC  for the past year.

29.     Upon information and belief, the Funds and the Union communicated directly with DC 14 and encouraged and cajoled DC 14 to cease working with Joy's Cleaning Services, LLC even though DC 14 employees like Dan Penski liked working with Joy's Cleaning Services, LLC.

30.     Upon information and belief, the Funds and the Union falsely represented to DC 14 that the Company's payments to the Union and the Funds were in arrears or delinquent because they sought to cause DC 14 to stop doing business with Joy's Cleaning Services, LLC  – which is exactly what happened.  The Funds and the Union acted maliciously toward Joy's Cleaning Services, LLC.

31.     DC 14 was satisfied with all of the work performed by Joy's Cleaning Services, LLC   and DC 14 would not have breached its contract with Joy's Cleaning Services, LLC had the Funds and the Union not intentionally interfered with the parties' contract.

8

32.     Joy's Cleaning Services, LLC has been damaged by an excess of $50,000.00 in lost revenue, lost profits, lost future profits, and their attorney's fees and costs, plus punitive damages as a result of the Funds and the Union's malicious interference with its contract.

WHEREFORE, Joy's Cleaning Services, LLC respectfully requests that this Court award Joy's Cleaning Services, LLC in excess of $50,000.00 in damages, plus consequential damages, future lost profits, and punitive damages in an amount to be determined at trial, costs of suit and any and all other relief that this Court deems appropriate under the circumstances.

**COUNT III**
**(Defamation Per Se / Business Disparagement)**
**Against Plaintiff-Counter Defendants Funds and Against Third-Party Defendant, the Union**

33.     Defendants incorporate and reallege the allegations in paragraphs 1–32 of this Counterclaim and Third-Party Complaint as if fully restated herein.

34.     On or about January 24, 2025, employees and agents of the Union and/or the Funds falsely stated to employees of Painters District Council 14 that Defendants "knowingly use illegal immigrants as labor."

35.     On that same date, Union employees and/or agents caused to be circulated and displayed written grievances falsely alleging that Armando Calderon, managing member of Defendants, had engaged in sexual harassment of employees.

36.     These statements were false when made and were published to third parties without privilege or justification.

37.     The statements imputed to Defendants criminal conduct, specifically Armando Calderon's, dishonesty in their trade or business, and unfitness to carry out their business responsibilities. As such, they constitute defamation per se under Illinois law.

38.     The statements were made intentionally and maliciously, with the purpose of harming Defendants' business reputation and inducing Painters District Council 14 to terminate its contractual relationship with Defendants.

39.     As a direct and proximate result of the defamatory statements, Defendants suffered harm to their reputation, loss of business, lost profits, and have incurred attorneys' fees and expenses. Punitive damages are warranted given the malicious nature of the statements.

WHEREFORE, Defendants respectfully request that this Court enter judgment in their favor and against Plaintiff-Counter Defendants and the Union on Count III, and award compensatory damages, presumed damages, punitive damages, costs of suit, and such other relief as this Court deems just and proper.

**COUNT IV**
**(Tortious Interference with Prospective Economic Advantage)**
**Against Plaintiff-Counter Defendants and Against Third-Party Defendant, the Union**

40.     Defendants incorporate and reallege the allegations in paragraphs 1–39 of this Counterclaim and Third-Party Complaint as if fully restated herein.

41.     Defendants had a reasonable expectancy of entering into and continuing valid business relationships with general contractors, labor organizations, and other customers in the Chicago metropolitan area, including but not limited to Power Construction Company and Painters District Council 14.

42.     Plaintiff-Counter Defendants and the Union knew about Defendants' existing and prospective business relationships.

43.     Plaintiff-Counter Defendants and the Union intentionally and maliciously interfered with Defendants' prospective business relationships by surveilling Defendants' workforce, spreading false statements regarding Defendants' business practices, and threatening customers with liens or labor unrest if they continued to work with Defendants.

44.     Plaintiff-Counter Defendants and the Union's conduct was unjustified, undertaken with the intent to harm Defendants and divert business away from them.

45.     As a direct and proximate result of this wrongful interference, Defendants lost not only their contracts with Power and DC 14, but also the reasonable expectancy

11

of future business with these and other entities, and have sustained damages including lost revenues, lost profits, loss of goodwill, and attorneys' fees and costs.

WHEREFORE, Defendants respectfully request that this Court enter judgment in their favor and against Plaintiff-Counter Defendants and the Union on Count VI, and award compensatory damages, future lost profits, consequential damages, punitive damages, costs of suit, and such other relief as this Court deems just and proper.

By:    _/s/Ross I. Molho_____

Ross I. Molho
Molho and Associates, LLC
1751 S. Naperville Road, Suite 209
Wheaton, IL  60189
Direct:  630-517-2622
Ross@MolhoLaw.com

Todd A. Miller (tam@alloccomiller.com)
Kathleen M. Cahill (kmc@alloccomiller.com)
Allocco, Miller & Cahill, P.C.
20 N. Wacker Drive, Suite 3517
Chicago, IL 60606
Ph: (312) 675-4325

## Certificate of Service

The undersigned certifies that on September 15, 2025, he caused this Counterclaim and a Third Party Complaint  to be served via email and via the Clerk of Court, using the Court's CM/ECF system, notification of which will be sent to all counsel of record, including those counsel below.

Patrick T. Wallace
Laborers' Pension and Welfare Funds
Office of Fund Counsel
11465 W. Cermak Road
Westchester, IL  60154
Patrickw@chilpwf.com
_/s/ Ross I. Molho_____

12

# Exhibit 1



**Power Construction Company, LLC**
**8750 W. Bryn Mawr, Ste 500, Chicago, IL 60631-3546**
**312/596-6960 T  312/604-1531 F**

**MASTER AGREEMENT**

THIS ("AGREEMENT") made 2025-01-13 by and between

### Joys Union Clean Up Services LLC
### 112 Day Street Unit 104
### Bloomingdale, IL 60108

(hereinafter called 'Subcontractor') and POWER CONSTRUCTION COMPANY, LLC an Illinois Limited Liability Company, (hereinafter called "General Contractor") and its Affiliates WITNESSETH:

### RECITALS

A.  Subcontractor and General Contractor may work together on construction projects from time to time.

B.  General Contractor's Affiliates may also exercise the rights of General Contractor under this Agreement. It is hereby agreed between the parties that all rights and obligations existing between General Contractor and Subcontractor shall apply between General Contractor's Affiliates and Subcontractor.

C.  Subcontractor and General Contractor wish to achieve greater efficiencies in their future work together by entering into this Agreement and entering into project specific agreements which incorporate this Agreement (each, a "Project Specific Agreement" or "PSA", and collectively, the "Project Specific Agreements").

D.  In this Agreement, the following terms shall have the following meanings:

"Affiliate(s)" shall mean any company, subsidiaries, and joint ventures where General Contractor either directly or indirectly controls 50% or more shares.

"Agreement" means this Master Agreement, as amended from time to time, including, without limitation, pursuant to one or more Project Specific Agreements;

"Architect" means, for each Project, the architect or Design-Builder set forth in the applicable Project Specific Agreement;

"Contract Documents" means, for each Project, the applicable general, special, supplementary and other conditions, if any, drawings, specifications, addenda, amendments, alternates and other documents that relate to or are a part of the Project Specific Agreement;

"Contract Sum" means, for each Project, the contract sum set forth in the applicable Project Specific Agreement;

"General Contract" means, for each Project, the general contract between General Contractor, or Design-Builder, and the applicable Owner, as set forth in the applicable Project Specific Agreement;

"General Contractor" means, Power Construction Company LLC along with its Affiliates, it successors and assigns, as set forth in the applicable Contract Documents.

"Project" means the applicable project set forth in each Project Specific Agreement;

"Project Specific Agreement" or "PSA" has the meaning set forth in Recital C;

"Owner" means, for each Project, the owner set forth in the applicable PSA; and

"Work" has the meaning, for each Project, as set forth in Article 1.

E.   Whenever in this Agreement the Subcontractor and/or General Contractor represents, warrants, covenants, agree to consent to, acknowledges, ratifies or affirms any matter, however styled, such representation, warranty, covenant, agreement, consent, acknowledgement, ratification or affirmation shall be deemed to occur as of the date of, and with respect to, each applicable PSA.  By way of example, and without limitation, under Article 1, below, Subcontractor agrees to be bound by certain Contract Documents.  Such agreement to be bound by the Subcontractor shall apply to the Contract Documents applicable to each PSA. Furthermore, any rights and remedies hereunder shall apply to the specific Project that gave rise to such rights and remedies.

**NOW, THEREFORE**, Subcontractor and General Contractor, for the considerations hereinafter stated incorporate the foregoing Recitals and agree as follows:

**ARTICLE 1:     SUBCONTRACTOR'S WORK**
A.      The Subcontractor shall provide and pay for all labor, materials, tools, plant, supplies, scaffolding, transportation, insurance, taxes, equipment, competent full-time supervision, and all other services and do all things necessary for the proper and complete performance, installation, and construction of all of the work identified in the attached Project Specific Agreement, which is incorporated herein by reference as though herein set out in full, (hereinafter called "Work') under and in accordance with the General Contract dated [See PSA] between [See PSA] (hereinafter called "Owner") and General Contractor for the construction and completion of the [See PSA] (hereinafter called "Project") located at [See PSA] (hereinafter called "Job Site") in strict accordance with General; Special; Supplementary and other Conditions if any, Drawings, Specifications and Addenda which are attached thereto; Amendments and Alternates (hereinafter collectively called "Contract Documents") [See PSA], all as prepared by [See PSA], hereinafter called "Architect".

B.      This Agreement, the General Contract between Owner and General Contractor and the Contract Documents thereto, are made a part of this Agreement to the same extent as if attached hereto. At the request of the Subcontractor, General Contractor agrees to provide Subcontractor with a copy of the Contract Documents, if available.

C.      The Subcontractor shall not be liable for any special, indirect, consequential, administrative, penal or any economic loss damages; provided that the General Contract between General Contractor and Owner grants General Contractor the same and/or similar exclusion on liabilities.  Additionally, Subcontractor shall be responsible for any damages contributed to, by delay to General Contractor to the extent caused by the Subcontractor, its sub-subcontractors or suppliers. Notwithstanding anything contained within this Agreement, this waiver or limitation of liability shall not apply to the liabilities defined in Article 15 herein.

**ARTICLE 2:     COMPLETE AGREEMENT**
A.      Subcontractor covenants, warrants and represents that, prior to entering into each Project Specific Agreement, it has examined and understands all of the Contract Documents and is fully aware of all of the terms and provisions recited in them and that it consents to all such provisions.  Subcontractor represents that it is fully qualified to perform this Agreement, and acknowledges that, prior to the execution of this Agreement, it has (a) by its own reasonable independent investigation ascertained (i) the Work required by this Agreement, (ii) the known conditions involved in performing the Work, and (iii) the obligations of this Agreement and the Contract Documents; and (b) reasonably verified all information furnished by General Contractor or other satisfying itself as to the correctness and accuracy of that information. Any failure by Subcontractor to reasonably investigate independently and become fully informed will not relieve Subcontractor from its responsibilities hereunder. Notwithstanding anything herein to the contrary, Subcontractor is not responsible for the errors or omissions of other subcontractors contracted by the General Contractor.

B.      The parties agree that this Agreement contains all terms and conditions agreed upon between them and that all prior conversations, understandings, agreements, promises, letters, quotations, qualifications and writings are null and void unless they are specifically included herein.  Subcontractor agrees to be bound by the provisions of the General Contract insofar as it pertains to the Work to be done by Subcontractor hereunder, notwithstanding any contrary provisions in any specifications, amendments, addenda, and drawings, and to perform on behalf of General Contractor, each and all of General Contractor's obligations under the General Contract in reference to the Work hereby subcontracted to Subcontractor.  Any decision of Architect or Owner which is binding on General Contractor relative to Subcontractor's Work shall also be binding on Subcontractor.  No orders, interpretations, or modifications of any Contract Documents shall be construed as, in any way, altering or reducing Subcontractor's obligations, unless such orders, interpretations, or modifications are in writing and signed by an officer of General Contractor with the consent and approval of Architect and Owner.  In the event of any discrepancy or inconsistency between this Agreement and the Contract Documents, the more stringent provision or requirement shall take precedence.

C.      This Agreement shall be in effect for five (5) years but shall also continue in effect for the duration of any Project commenced hereunder within such period (the "Initial Term"). This Agreement shall renew for successive one (1) year renewal terms unless General Contractor delivers written notice of non-renewal to the Subcontractor at least sixty (60) calendar days before expiration of the Initial Term or before expiration of a renewal term as applicable.

D.      Subcontractor shall reasonably inspect the site and become fully acquainted with all known conditions pertaining to the Work hereunder, prior to signing the PSA. Execution of the PSA by Subcontractor shall constitute an acceptance by Subcontractor of the known conditions of the site and the Project's requirements and obligations pertaining to the Work hereunder.

**ARTICLE 3:      CONTRACT SUM**
A.      Subject to additions and deductions made as provided hereafter in Article 13 and, to the extend allowed by the applicable State law, subject to receipt of payment from Owner, which is a condition precedent to General Contractor's obligation to pay Subcontractor, General Contractor, in the manner hereinafter specified, agrees to pay Subcontractor for the full and faithful performance of the Agreement, the contract sum (hereinafter called the "Contract Sum") of [See Project Specific Agreement]. If Owner, through no fault of General Contractor, shall fail to pay said General Contractor for Subcontractor's Work then the obligation of General Contractor and its surety, if any, to Subcontractor shall, to the extent allowed by the applicable State law, be limited solely to pursuing, at Subcontractor's expense, such legal remedies as are available to it to cause Owner to pay for such Work.

**SEE STATE SPECIFIC ADDENDUM FOR PAYMENT SECTIONS WHICH WILL TAKE PRECEDENT AND CONTROL IN THE SPECIFIC STATES LISTED.**

**ARTICLE 4:      SUBCONTRACTOR'S OBLIGATIONS**
A.      Certain sections of the General Conditions, Specifications, and Addenda may have been attached hereto for the convenience of the Subcontractor. It is agreed, however, that the Subcontractor's obligations are not limited to the attached sections and that they may be affected by other sections of the Contract Documents including, but not limited to, the General Conditions, Supplementary General Conditions, Instructions to bidders, Specifications, Addenda, Amendments or Alternates which, because of the large number of pages involved, have not been attached but are available for examination by the Subcontractor at the main office and field office of the General Contractor. All provisions of the Contract Documents, including but not limited to the General Conditions and Supplemental General Conditions, which impose obligations upon the Subcontractor are incorporated herein by reference as if set forth herein in full, and the Subcontractor shall be deemed to have read and understood all of said provisions and agreed to fulfill all of such obligations. At the request of the Subcontractor, General Contractor agrees to provide Subcontractor with an electronic copy of the Contract Documents, if available.

**ARTICLE 5:      FIRM CONTRACT SUM**

A.      The Contract Sum specified in Article 3 above is a firm sum and any increase in the cost of labor, equipment or materials during the performance of the Work shall be borne by the Subcontractor unless it is incurred due to a change

order or other compensable event as defined in the Contract Documents. Likewise, any savings in such costs shall inure solely to Subcontractor's benefit. Subcontractor acknowledges that, for an infinite number of reasons, the Project may not be completed within the time presently specified in the General Contract and that, because of such delays, Subcontractor may incur substantial additional expenses, costs and liabilities in the performance of its Work. In the event that the Project cannot be completed by the scheduled completion date due to the fault of the Subcontractor and Subcontractor is required to perform its Work beyond the completion date required by the General Contract, then the General Contractor, Owner and Architect shall not be liable to Subcontractor for any increase in cost of labor, materials, services, losses or damages of any kind. In the event that, for any other reason, the Project cannot be completed by the scheduled completion date and Subcontractor is required to perform its Work beyond the completion date required by the General Contract, or this Agreement, Subcontractor agrees that, as an inducement to General Contractor to enter into this Agreement, the General Contractor, the Owner and the Architect shall be not liable to Subcontractor for any increase in cost of labor, materials, services or any other losses, costs, expenses, or damages of any kind and description incurred by Subcontractor to the extent allowed under the General Contract.

**ARTICLE 6:    TAXES**

A.      The Subcontractor hereby assumes and agrees to pay all sales, use and other taxes levied or imposed on account of the sale of all tangible personal property required by or used in the performance and execution of the Agreement, and all taxes, duties or charges levied or imposed, whether by any municipality, county, township, state, or the United States of America, on the materials and equipment provided and compensation paid by the said Subcontractor to individuals employed by it in the performance and execution of the Agreement, and any interest or penalties assessed or imposed in connection with such taxes, contributions and charges.

B.      Subcontractor waives any and all claims for additional compensation because of any new duties or taxes or any increases in the aforementioned duties or taxes unless payment therefor is specifically provided for in the Contract Documents, and General Contractor receives same from Owner.

**ARTICLE 7:    PAYMENTS**

A.      All payments due to by General Contractor to Subcontractor under this Agreement shall be subject to receipt of payment from Owner, which is a condition precedent to General Contractor's obligation to pay Subcontractor. If Owner, through no fault of General Contractor, shall fail to pay said General Contractor for Subcontractor's Work, then the obligation of General Contractor and its surety, if any, to Subcontractor shall be limited solely to pursuing, at Subcontractor's expense, such legal remedies as are available to it to cause Owner to pay for such Work. For payment requests which are made on account of materials or equipment not incorporated in the Work but delivered and suitably stored at the site or at some other location agreed upon in writing, payments therefor shall only be made to extent that General Contractor is entitled to and receives payment from Owner under the terms and conditions of the General Contract. Each payment to Subcontractor on account of pending change orders shall be equal to Subcontractor's allowable share of General Contractor's payment from the Owner for the pending change as determined by General Contractor.  Changes to the Contract Sum and other adjustments to this Agreement shall be made only to the extent that General Contractor is entitled to relief from or must grant relief to Owner.

B.      As a condition to payment, Subcontractor shall, at least thirty (30) business days before each payment hereunder becomes due, deliver to General Contractor an Applications for Payment and Trade Payment Breakdown on General Contractor's form showing each item of labor and materials incorporated into the Work during the preceding pay period and the value thereof. It shall be a further condition of any payment to Subcontractor that, from time to time as may be required by General Contractor or the General Contract in applying for payment from the Owner, Subcontractor shall furnish to General Contractor waivers of mechanics' liens, provided Subcontractor has been paid in accordance with the General Contract, and written statements, verified by affidavit and in form acceptable to General Contractor, which disclose the names of all parties furnishing materials or labor to Subcontractor, or its subcontractors, and the amounts due, and to become due, each of them.

C.      All payments received by the Subcontractor shall be held in trust by Subcontractor and shall be used solely for payment of all labor, materials, equipment, services, Subcontractor's subcontractors and all other obligations incurred by the Subcontractor in connection with the performance of the Work and shall not be used for any other purpose by

4

the Subcontractor until all obligations of Subcontractor in connection with this Work are satisfied in full. All material and work incorporated into the Project shall become the property of General Contractor, if the Contract Documents so provide, the property of the Owner.

D.      If the General Contractor in its sole discretion, determines that it is appropriate to pay any of Subcontractor's lower tier subcontractors or suppliers or others claiming through Subcontractor directly or jointly, the General Contractor may, at its sole option, direct payments or joint order payments to Subcontractor's lower tier subcontractors and suppliers and others claiming through Subcontractor, and the amount so paid shall be deducted from amounts owed to the Subcontractor. No direct payment or joint payment made by General Contractor shall create any obligation for General Contractor to make any future direct or joint payments.

E.      If, at any time, provided Subcontractor has been paid all amounts properly due in accordance with the General Contract, including subsequent to the completion of the Subcontractor's Work and final payment to it, any lien, claim of lien, bond or subcontractor default insurance policy claim against the General Contractor's surety or insurer, if any, should appear which arises out of labor, material, and/or equipment furnished, or purportedly furnished, by Subcontractor, Subcontractor agrees to promptly and completely indemnify and hold General Contractor, Architect and Owner and each of them, harmless from and against any loss, liability, damage, costs and expenses of every kind and description, including but not limited to title insurance costs and expenses, costs of special endorsements, and court costs and reasonable attorney's fees, sustained or incurred by reason thereof. Subcontractor shall, at its sole expense, defend any suit brought to enforce such lien, claim of lien, bond or subcontractor default insurance policy claim and shall promptly pay, in full, any judgment, interest, costs and reasonable attorney's fees entered in said suit. No payment bond or performance bond furnished General Contractor to Owner or subcontractor default insurance policy obtained by General Contractor shall be deemed to relieve the Subcontractor of any of its obligations hereunder or to modify or terminate any rights of the General Contractor hereunder. In the event any creditor or claimed creditor of Subcontractor asserts any claim or action against General Contractor by way of garnishment, creditor's bill or otherwise to obtain any monies due or to become due Subcontractor under this Agreement, Subcontractor agrees to pay General Contractor the amount of any costs, expenses and reasonable attorney's fees which it may expend or incur in the defense of such claim or action.

F.      No progress payment made under this Agreement shall be conclusive evidence of the performance of the Agreement, either wholly or in part, and no payment shall be construed to be an acceptance of Defective Work (as defined in Article 18) or improper materials.

G.      During the satisfactory progress of the Work and in accordance with the General Contract, only after General Contractor has received payment therefor from Owner, General contractor shall pay to Subcontractor 90% (or the amount required by the State law) of the value of labor and materials incorporated into the Project through the last day of the preceding pay period as estimated by General Contractor, and approved by Architect or Owner, less the aggregate amount of previous payments, provided, however that Subcontractor shall not be entitled to a payment which, in the reasonable judgment of General Contractor, will leave the unpaid balance insufficient to complete the Work by Subcontractor hereunder and to pay unpaid amounts owed by Subcontractor to its suppliers of labor and materials; and provided, further that, if at any time before final payment, there should be reasonable evidence of any unpaid, or allegedly unpaid, obligation of Subcontractor for which a lien, notice of claim, or bond claim against General Contractor's Surety, if any, has been or could be claimed, General Contractor shall have the right to retain out of any monies due or to become due Subcontractor, a sufficient amount to indemnify General Contractor and Owner, and each of them, against loss, liability, expenses and exposure in connection with such claim or potential claim, to the fullest extent permitted by local statutes specific to the Project's location.  Subcontractor agrees that General Contractor, after giving written notice to Subcontractor, may pay all persons who have not been paid the monies due them in connection with this Agreement, whether or not a lien or bond claim has been filed, unless Subcontractor, within ten (10) days after receipt of written notice, or within such reasonable period as General Contractor finds necessary to meet its obligations to the Owner, (i) demonstrates to General Contractor's satisfaction that such sums are not due and/or (ii) provides General Contractor adequate security as defined within the Contract Documents as allowed under the applicable mechanics lien statute or other applicable law of the State in which the Project is located.  Notwithstanding anything to the contrary, General Contractor has the right to withhold payments to Subcontractor because of any of the following:

5

(i) Defective Work not remedied; (ii) third party claims or reasonable evidence indicating probable filing of third party claims; (iii) failure of Subcontractor to make payments promptly to subcontractors or suppliers of any tier for labor, materials or equipment; (iv) reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum; damage to the General Contractor; or (v) reasonable evidence that the Work will not be completed within the required Subcontract time, and that the unpaid balance is not adequate to cover actual or liquidated damages for the anticipated delay; and for repeated failure to carry out the Work in accordance with the Contract Documents. In addition, General Contractor may withhold amounts otherwise due under this Subcontract or any other agreement between the parties to cover General Contractor's reasonable estimate of any loss, damages or liabilities that General Contractor has incurred or may incur for which Subcontractor may be responsible under this Subcontract or any other agreement between the parties. If Subcontractor has completed its portion of the Work, including all punch list items, General Contractor may request the Owner to disburse the retention allocable to such Subcontractor. Notwithstanding the foregoing, the warranty period with respect to the Work shall commence at Substantial Completion of the Project as defined by the Contract Documents.

H.      Final payment shall become due to Subcontractor only after Certificate of Final Acceptance or similar document signifying final acceptance has been issued by the Architect or Owner and after final payment for Subcontractor's Work is made by Owner to General Contractor and (i)) all required final waivers, affidavits, guarantees, releases, as-built drawings, attic stock, are submitted to General Contractor by Subcontractor, (ii) all punch lists, all Work, and all requirements of Subcontractor under the Agreement are competed and, (iii) satisfactory evidence is given to General Contractor that all bills, claims or other obligations of Subcontractor have been discharged in full. If there are any unsettled injuries, claims for injuries, or alleged injuries to persons or property when the Work herein provided for is finished, final payment to Subcontractor shall be deferred until such claims are adjusted or suitable special indemnity and/or insurance acceptable to General Contractor is or has been provided by Subcontractor. No certificate issued, or payment made to Subcontractor, nor any partial or entire use or occupancy of the Project by Owner shall be an acceptance of any Work not in accordance with the Contract Documents or deemed to be evidence of proper performance of the Work.

**SEE STATE SPECIFIC ADDENDUM FOR PAYMENT SECTIONS WHICH WILL TAKE PRECEDENT AND CONTROL IN THE SPECIFIC STATES LISTED.**

**ARTICLE 8:      TIME**
A.      Time is of the essence for the Agreement. General Contractor and Subcontractor shall agree on a mutually agreeable project schedule, and revisions thereto, with information identifying project specific milestones, sequence's durations for the completion of the Subcontractor's Work.  Subcontractor shall begin its Work promptly following reasonable written notice from General Contractor shall prosecute such Work diligently and in coordination and cooperation with other subcontractors and other Work on the Project, and shall, at all times, expedite its Work so as to permit the earliest completion of the Project. Subcontractor shall perform its Work in strict accordance with progress schedule prepared and maintained by General Contractor and shall otherwise perform its Work in such sequence and at such rate of progress as, in the sole judgment of General Contractor, is necessary to achieve earliest possible completion of the entire Project with emphasis on those portions of the Project which General Contractor deems most urgent. Subcontractor further agrees that, if it delays the progress of its Work due to its failure to perform and not related to or caused by circumstances beyond its control, so as to cause any damage or penalty for which General Contractor shall become liable, Subcontractor shall promptly, on written demand, reimburse General Contractor for any such amount.

**ARTICLE 9:      PROGRESS SCHEDULE**
A.      Subject to Article 8 above, General Contractor has prepared, or may prepare, a progress schedule in reference to Work under the General Contract. General Contractor does not represent or warrant to Subcontractor either that Work will be done in the sequence indicated by the progress schedule or at the times indicated therein. If the Work is behind the progress indicated by such progress schedule, as a result of the negligence or other fault of Subcontractor, Subcontractor shall not be entitled to any additional compensation or damages by reason thereof except as stated in Article 5 herein. Subcontractor shall also not be relieved of its obligation to diligently prosecute its Work. Further, if the Project is behind schedule as a result of the negligence or other fault of Subcontractor and General Contractor determines, in its sole discretion, that it is necessary to expedite completion, Subcontractor agrees to fully cooperate

with the General Contractor in expediting completion of said Project by furnishing such additional crews and equipment as the General Contractor instructs Subcontractor to furnish and/or require its personnel to work such additional hours as the General Contractor deems are required to expedite the completion of said Project within the time required. Subcontractor and General Contractor agree that, in the event Subcontractor incurs any additional costs because it is required to furnish additional crews and/or to work its personnel overtime at General Contractor's request due to delays through no fault of the Subcontractor, such costs shall be reimbursable by the General Contractor as allowed by the General Contract. General Contractor shall be the sole judge of its entitlement to recover said costs and expenses from Owner. Subcontractor agrees that the General Contractor's decision in that regard shall be final and binding upon it. Subcontractor further agrees to indemnify General Contractor from any and all costs and expenses, including reasonable attorney's fees, which General Contractor may incur in making claim against the Owner for Subcontractor's said additional costs and expenses.

B.        General Contractor has contracted to complete the Project by [See PSA]. In accepting this Agreement, Subcontractor agrees that it will perform its Work to permit completion per the agreed upon project schedule, but in no event later than said date. If Subcontractor neglects, fails or refuses to timely perform any portion of the Work, Subcontractor shall be liable for, and shall reimburse General Contractor for, all costs and damages incurred by General Contractor because of Subcontractor's delays and improperly timed activities, including but not limited to acceleration, out-of-sequence Work and other mitigation, and for damages to the Work and the work of General Contractor and any other subcontractors, and defective construction. General Contractor shall be entitled to pursue its remedies as defined in Article 7, but not excluding such remedies as defined in Article 15 below.

**ARTICLE 10:    SUBCONTRACTOR BONDS**

A.        If requested by General Contractor or Owner, Subcontractor shall provide and pay for, as separate and distinct items. Each PSA will indicate whether Payment and Performance Bonds are required for each project.   When Payment and Performance Bonds are required, the Subcontractor will include the cost of these bonds in the Subcontractor's Contract Sum:

1.    Performance Bond which shall guaranty the full and faithful performance of each and every provision of this Agreement, and each and every provision of the General Contract and each and every provision of the Contract Documents pursuant to which this Agreement is executed; and

2.    Labor and Material Payment Bond assuring that all materials incorporated into the Work referred to in this Agreement, and all labor required in and about the performance of the Work, and all other items referred to in this Agreement, are fully paid;

B.        Except as otherwise provided in subparagraph B of this Article, each of said bonds shall be: (i) in strict accordance with General Contractor's bond form provided in an amount or penalty equal to 100% of the Contract Sum hereunder; and, (ii) written with a corporate surety approved by General Contractor, but in no case shall said surety carry a rating of less than "A", as rated by "Best's Key Rating Guide". All costs associated to these bonds shall be included in the Subcontractor's Contract Sum.

C.        Failure of Subcontractor to submit said bonds, or either of them, within fifteen (15) days after delivery of each PSA to Subcontractor executed by General Contractor shall be sufficient cause for General Contractor, at its option, exercisable by written notice to Subcontractor: (1) to terminate the PSA as of a date specified in such notice, reserving all its rights arising from or incident to this Agreement accrued to the termination date; or (2) to withhold all payments due or which may become due hereunder until such bonds are received and approved by General Contractor.

D.        Notwithstanding any language in the Performance or Payment Bonds which might indicate to the contrary, the Performance and Payment Bonds shall specifically extend to and cover the entire term of each guarantee, warranty and maintenance obligation of Subcontractor and such bonds shall be deemed to be amended so as to fully cover such obligations.

**ARTICLE 11:    INSURANCE**

A.      Subcontractor shall maintain sufficient insurance (in amounts not less than those specified by the attached "Exhibit C" or required by the General Contract, General Contractor or as required by the governing law, whichever is greater) to protect it, General Contractor, Architect, and Owner and such other parties as are required by General Contractor or the Contract Documents, and each of them, from claims under workers' compensation disability benefit laws and other similar employee benefit acts, and also from any other claims for damages as a result of property damage, personal injury, or death suffered by employees, or persons other than employees which may arise from operations under the Contract Documents, and/or against liability arising or claimed to arise out of  Subcontractor's performance of Work, whether such operations be by Subcontractor, or any of Subcontractor's subcontractors, or employees, or anyone directly or indirectly employed by either of them, or acting as agents for either of them.  Such insurance shall include a so-called contractual liability provision or endorsement insuring Subcontractor against its indemnifying obligations under the Contract Documents.

B.      Adequate Certificates of Insurance, with additional-insured endorsements attached, from companies satisfactory to General Contractor and according to the Contract Documents, shall be filed with General Contractor before commencement of the Work hereunder.  Upon Subcontractor's failure to do so, General Contractor shall have the option to have such insurance written and charge the cost of the policies therefor to Subcontractor or to terminate Subcontractor pursuant to Article 15 of this Contract.  Failure of Subcontractor to issue or maintain proper Certificates of insurance with General Contractor shall constitute an act of default by Subcontractor and, in addition to the remedies specified in Article 15 of this Contract, shall be cause for General Contractor to withhold all payments which are due or become due until such proper Certificates are issued, in compliance with the Contract Documents and such insurance is in force.  Subcontractor's insurance shall further provide that said insurance policies shall not be changed or cancelled during their terms until at least thirty (30) days after General Contractor receives written notice from the insurers of their intention to cancel their policies, and that said insurance runs in favor of General Contractor and/or Subcontractor as their interests may appear.  Compliance by Subcontractor with the foregoing requirements, as to carrying insurance and furnishing Certificates of Insurance, shall not relieve Subcontractor from its indemnity obligations under this Agreement.  Subcontractor shall include the provisions in similar to this Article 11 in Subcontractor's subcontracts.

C.      In respect to the general liability and property damage insurance which Subcontractor is obligated to purchase by the foregoing provisions, Subcontractor agrees to cause, at its sole expense, General Contractor, Architect, and Owner, and such other parties as General Contractor is required to indemnify by the Contract Documents, to be named as Additional Insureds under said policy or policies of insurance.  The Certificate of Insurance shall indicate that Subcontractor's policy shall be Primary Insurance and that, if the Additional Insureds have other Insurance which is applicable to the loss, such other insurance shall be on an excess basis.  The coverage shall further provide that the amount of Subcontractor's liability under this policy shall not be reduced by the existence of such other insurance.  The coverage shall also provide that defense counsel is subject to the approval of General Contractor, such approval shall not be unreasonably withheld, as Additional Insured.  In any and all claims against General Contractor, or any of its agents or employees, by any employee or agent of Subcontractor, or by anyone directly or indirectly employed by Subcontractor for whose acts he may be liable, the indemnification provisions under this Agreement and/or the Contract Documents by Subcontractor in favor of General Contractor shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for Subcontractor under workers compensation disability benefit laws and other similar employee benefit acts.  The policy shall provide that Subcontractor waives all rights against General Contractor, the Owner and such other parties as are required by General Contractor and/or the Contract Documents, for losses within the Work of and covered by Subcontractor's insurance.

D.      Subcontractor must maintain completed operation coverage for a minimum of two (2) years but not less than what is allowed by State law, after final payment or such other longer period as may be required by the Contract Documents. The obligations of the Subcontractor pursuant to this Article 11 shall survive the termination, completion, or expiration of this Agreement.

**SEE STATE SPECIFIC ADDENDUM FOR PAYMENT SECTIONS WHICH WILL TAKE PRECEDENT AND CONTROL IN THE SPECIFIC STATES LISTED.**

## ARTICLE 12:    INDEMNIFICATION

A.      To the fullest extent permitted by law, Subcontractor's obligations hereunder shall include, but are not limited to, obligations to defend, through counsel reasonably acceptable to General Contractor, indemnify, and save harmless General Contractor, Architect, and Owner, and such other parties as General Contractor is required by the Contract Documents to indemnify from and against any and all claims, demands, suits, actions, expenses, judgments, losses and liabilities, including fines and penalties, costs and reasonable attorney's fees arising out of or claimed to arise out of injuries to persons including, but not limited to, death, or to tangible and intangible property, including but not limited to the loss of the use thereof occasioned by or growing out of the execution or performance of Subcontractor's Work hereunder by either Subcontractor or Subcontractor's subcontractors or sub-subcontractors or suppliers , but only to the extent caused by the negligent acts or omissions of Subcontractor or anyone directly or indirectly employed by them, or anyone for whose acts they may be liable. Subcontractor's indemnifying obligation hereunder does not, however, include any claims, demands, judgments, suits, actions, expenses, losses and liabilities, including costs and reasonable attorney's fees, which are solely caused by negligence of General Contractor, Architect, Owner and such other persons, whichever the case may be. If the obligation to indemnify and hold harmless set forth in this Section is broader than that allowed by the applicable State law, this Section 12 should be interpreted as providing the broadest indemnification and hold harmless obligation permitted and should be limited only to the extent necessary to comply with that law. The obligations of the Subcontractor pursuant to this Article 12 shall survive the termination, completion, or expiration of this Agreement.

B.      To the fullest extent permitted law, Subcontractor shall  indemnify, reimburse, defend, and hold harmless General Contractor, Architects and Owner from and against all fines, sanctions, claims, losses, penalties, damages, expenses, costs or other liability incurred by General Contractor arising out of any (i) breach by Subcontractor or its employees, agents, or subcontractors of any provisions of this Agreement; or (ii) violation by Subcontractor or its employees, agents, or subcontractors of applicable laws, rules or regulations; or (iii) loss, theft or breach of security of any information relating to any identified or identifiable data subject or as otherwise defined as applicable data protections laws due to Subcontractors error or omission in protecting its data or IT network. The provisions of this Section shall survive termination or expiration of the Agreement.

**SEE STATE SPECIFIC ADDENDUM FOR PAYMENT SECTIONS WHICH WILL TAKE PRECEDENT AND CONTROL IN THE SPECIFIC STATES LISTED.**

## ARTICLE 13:    CHANGES

A.      All provisions and requirements of the General Contract, including procedural provisions and requirements, shall apply to any changes, omissions or extra work ("Changes") hereunder in like manner, and to the same extent, as they apply to Changes under the General Contract and no such Changes shall annul or invalidate this Agreement. As to any such Changes:

1.  General Contractor may, at any time, unilaterally or by agreement with Subcontractor, without notice to the sureties, make Changes in the Work covered by this Agreement. Any unilateral order or agreement under this Article 13 shall be in writing. Subcontractor shall perform the Work, as changed, without delay. Subcontractor shall not be required to perform additional work prior to receipt of the duly authorized Changes or without the parties' written agreement detailing the scope of the additional work, scheduling, and whether the additional work is compensable to Subcontractor. Any disputes between the General Contractor and Subcontractor shall be subject to Article 14 of this Agreement.

2.  Subcontractor shall submit to General Contractor any requests or claims for adjustment in the sum, schedule or other provisions of the Subcontract as a result of alleged deficiencies or discrepancies in the Contract Documents, or for circumstances otherwise permitted by the Contract Documents. Said requests or claims shall be submitted in writing by Subcontractor in time to allow General Contractor to comply with the applicable provisions of the Contract Documents.  General Contractor shall process said requests or claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interest of Subcontractor and other including General Contractor.  Subcontract adjustments shall be made only to the extent that General Contractor is entitled to relief from or must grant relief to the Owner. Further, each

Subcontract adjustment shall be equal only to Subcontractor's allocable share of any adjustment in General Contractor's contract with the Owner. Subcontractor's allocable share shall be determined by General Contractor, after allowance of General Contractor's normal overhead and profit on any recovery and General Contractor's expense of recovery, by making a reasonable apportionment, if applicable, between Subcontractor, General Contractor, and other subcontractors or persons with interests in the adjustment. This paragraph shall also cover other equitable adjustments or other relief allowed by the Contract Documents.

3. Payment on account of pending Changes made by Owner shall be made pursuant to Article 7 herein. Amounts paid on account of pending Changes are provisional and not an admission of liability and shall be repaid to General Contractor on demand whenever General Contractor determines there has been an overpayment.

4. For Changes ordered by General Contractor, independent of the Owner or the Contract Documents, Subcontractor shall be entitled to an equitable adjustment in the Contract Sum as determined by General Contractor subject to rates provided in each PSA, or upon request of the General Contractor. If Subcontractor considers any action or inaction by General Contractor, other than a formal change order to be a change, it shall notify General Contractor within three (3) days after the commencement of said action or inaction and shall request appropriate relief from General Contractor. Failure to comply with this procedure shall constitute a waiver of Subcontractor's right, if any, to compensation for such action or inaction.

5. Subcontractor shall, within seven (7) days after receipt of a request by General Contractor, submit a complete and detailed price quotation for proposed Changes. If Subcontractor fails to do so and General Contractor is required to submit a proposal to the Owner which includes a proposed change to Subcontractor's Work, General Contractor shall use its best estimate of the proposed change and the cost thereof, as it affects the Subcontractor's Work, in its quotation to the Owner, which estimate shall be the maximum equitable adjustment due to Subcontractor.

6. Subcontractor agrees that the maximum allowable percentages for overhead and profit to this Subcontractor on proposals which represent an increase in the cost of the Work shall be limited to [See PSA] for overhead and [See PSA] for profit with no additional markup allowed for bond premiums (unless said additional markup for bond premiums is specifically allowed by the General Contract, and General Contractor receives payment for same). For Work performed by sub-subcontractors, markup by Subcontractor shall be limited to 5% or more if allowed by the General Contract.

**ARTICLE 14: SETTLEMENT OF DISPUTES**

A. In the event of any dispute between General Contractor and Subcontractor involving the Work to be performed hereunder, including any authorized Changes, General Contractor shall issue a decision which shall be followed by Subcontractor, without interruption, deficiency, or delay. If Subcontractor does not agree with such decision, Subcontractor's sole remedy shall be to make a claim for adjustment in the Contract Sum, Progress Schedule, or other provisions of this Agreement under Article 13.A.1 hereof and the matter shall be resolved as set forth in Article 14.B or 14.C hereof as applicable. If Subcontractor prevails, Subcontractor's sole remedy shall be the equitable adjustment, specified either in Article 14.B or 14.C, as applicable, of this Agreement. In addition to the notifications required of Subcontractor by Article 13 of this Agreement, Subcontractor also shall give written notice to General Contractor of its disagreement with General Contractor's decision not later than ten (10) business days after Subcontractor's receipt of General Contractor's decision except that, if a lesser period of time is required in order to allow General Contractor to give any notice it may be required to give to the Owner under the Contract Documents and/or under Article 13 of this Agreement, then Subcontractor shall give such notice to General Contractor in such lesser period of time.

B. In case of any dispute between General Contractor and Subcontractor, in any way relating to or arising from any act or omission of the Owner or involving the Contract Documents, Subcontractor agrees to be bound to General Contractor to the same extent that General Contractor is bound to the Owner, by the terms of the Contract Documents and by any and all preliminary and final decisions or determinations made thereunder by the party, board or court so authorized by the Contract Documents, or by law, to make such decisions or determinations, whether or not Subcontractor is a party to such proceedings. In case of such dispute, Subcontractor shall comply with all provisions of

the Contract Documents, allowing a reasonable time for General Contractor to analyze and forward to the Owner any required communications or documentation. Whenever permitted to do so by the Contract Documents, General Contractor, at its option, shall (1) present to the Owner, in General Contractor's name, or (2) authorize Subcontractor to present to the Owner, in General Contractor's name, all of Subcontractor's claims and to answer the Owner's claims involving Subcontractor's Work. General Contractor will further invoke on behalf of Subcontractor, or allow Subcontractor to invoke, those provisions in the Contract Documents for determining disputes. Nothing herein shall require General Contractor to certify a claim, including a claim under a government contract, when it cannot do so in good faith. If such dispute is prosecuted or defended by General Contractor, Subcontractor, at its own expense, agrees to furnish all documents, statements, witnesses, and other information required by General Contractor and to pay or reimburse General Contractor for all costs and expenses of every kind and nature incurred by General Contractor in connection with the dispute including reasonable attorney's fees. The Contract Sum shall be adjusted by Subcontractor's allocable share determined in accordance with Article 13 hereof.

C.      Any controversy between General Contractor and Subcontractor not relating to or arising from any action or inaction of the Owner and not involving the Contract Documents shall be decided by litigation in a State court of competent jurisdiction, in the jurisdiction where the Project is located. The prevailing party shall be entitled to full reimbursement of its attorney fees and any applicable interest as allowed by the applicable State laws.

WAIVER OF JURY TRIAL: WITH RESPECT TO ANY SUCH LITIGATION, EACH PARTY TO THIS AGREEMENT HEREBY KNOWINGLY, VOLUNTARILY AND WILLINGLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTION(S) CONTEMPLATED HEREBY AND/OR THE RELATIONSHIP ESTABLISHED AMONG THE PARTIES HEREUNDER.

D.      APPLICABLE ONLY TO DISPUTES BETWEEN GENERAL CONTRACTOR AND SUBCONTRACTOR FOR PROJECTS LOCATED IN ILLINOIS, and not relating to or arising from any action or inaction of the Owner and not involving the Contract Documents shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association.  Such arbitration shall be held in Chicago, Illinois.  The foregoing agreement to arbitrate shall be specifically enforceable in any court of competent jurisdiction.  General Contractor shall be entitled to consolidate or join this arbitration proceeding with any other arbitrations providing such other arbitration includes questions of fact in common with this arbitration and even though it may involve parties other than Subcontractor.  The award rendered by the arbitrators shall be final and judgment may be entered upon it in accordance with applicable law in any court of competent jurisdiction.  If General Contractor contends any arbitration brought under this Article 14.D involves a controversy within the scope of Article 14.B, the arbitration shall be stayed until the procedures under Article 14.B are completed and it is determined thereunder that the controversy does not fall within Article 14.B.

**ARTICLE  15:      DEFAULT BY SUBCONTRACTOR**

A.      If Subcontractor, or any of its lower tier subcontractors, shall, in the sole judgment of General Contractor, repeatedly refuse or fail to supply sufficient properly skilled workmen, supervisors, equipment or materials hereunder, or fail to make payments promptly to workmen, material houses or subcontractors, or disregard the written instructions of the General Contractor, or fall behind the Work due to the actions or omissions of Subcontractor, or if actions or omissions of Subcontractor so as to prejudice General Contractor's ability to finish the entire Project at the time required, or abandon the Work hereunder, or, fail in the performance of any terms and conditions of the Agreement, or shall make an assignment for the benefit of its creditors, then, in any such event, each of which shall constitute a default hereunder by Subcontractor, General Contractor shall have the right to exercise any one or more of the following remedies if Subcontractor does not commence or present to General Contractor an  appropriate remedy for approval to cure the default  within seventy-two (72) hours after General Contractor gives Subcontractor written notice of such default:

1.      withhold making payments to Subcontractor, including both progress and final payments which are either due or may become due to Subcontractor under the Agreement, until such default is cured and, if said default is not cured, to apply all such unpaid contract balances, including retainage, to reimburse General Contractor for all

losses, expenses including reasonable attorney's fees, damages, penalties, and fines, whether liquidated or unliquidated, direct or consequential which are incurred or sustained by General Contractor by reason of such default;

2.  require Subcontractor to provide and utilize, at its own expense, overtime labor (including Saturday and Sunday work) and additional supervisors, workmen and shifts as necessary to overcome the consequences of any delay attributable to Subcontractor;

3.  remedy the default by whatever means General Contractor may deem are reasonably expedient including, but not limited to, removing, replacing, correcting, furnishing, performing or completing the Work, or any part thereof, and repairing and replacing the Work or property of others that may have been damaged or destroyed by Subcontractor or its sub-subcontractors, by itself or through others (utilizing where appropriate any materials, equipment facilities, tools, scaffolding and other items previously purchased or provided for such purpose by Subcontractor) and to recover the cost (including  reasonable attorney's fees) of such remedial action from Subcontractor within forty-five (45) days of the commencement of said default (plus an allowance for administrative burden equal to 15 % of such costs):

4.  terminate the Agreement without hereby waiving or releasing any other rights or remedies against Subcontractor or its sureties, and, by itself or through others complete the Work and take possession of all materials, facilities, tools, scaffolds, appliances and other things belonging to Subcontractor and relating to the Work for such purpose, (and this Agreement shall be deemed to be an assignment by Subcontractor to General Contractor of the foregoing) and, for the purpose of securing to itself the payment of all costs (including reasonable attorney's fees) incurred in completing the Work (plus an allowance for administrative burden equal to 15% of such costs) and all other damages sustained as a result of the default and termination, which it shall be Subcontractor's obligation to pay, General Contractor is hereby authorized to establish an adequate reserve to protect General Contractor and Owner during the period of guarantee required of Subcontractor, which reserve shall be reasonably determined by General Contractor based upon the nature of the Work and the exposure of General Contractor:

5.  recover from Subcontractor all losses, damages, penalties, and fines, whether liquidated or unliquidated, direct or indirect, or consequential, and all costs, such as extended overhead, and expenses (including reasonable attorney's fees and court costs) suffered or incurred by General Contractor as a result of Subcontractor's default, including but not limited to extended overhead;

6.  terminate the Agreement if Subcontractor fails to comply with General Contractor's prequalification program.

B.      The foregoing remedies shall be considered separate and cumulative and shall be in addition to every other remedy provided hereunder, under the Agreement and at law and in equity now or at any time hereafter. If General Contractor wrongfully exercises its option under Article 15.A.3, such action shall be treated as a deductive change and Subcontractor's sole remedy and relief shall be limited to its entitlement for a deductive change order under the terms of this Agreement.  If General Contractor wrongfully exercises its option under Article 15.A.4, such termination for default shall be considered a termination under Article 16 of the Agreement for General Contractor's convenience. Subcontractor's sole remedy and relief shall be limited to the extent to which he would be entitled to the compensation specified in Article 16.

**ARTICLE  16:      TERMINATION FOR CONVENIENCE**
A.      General Contractor shall have the right to terminate, for convenience, Subcontractor's performance of all or a part of the Subcontractor's Work by providing Subcontractor with a written notice of termination for convenience to be effective upon receipt by Subcontractor. If there has been a termination of General Contractor's contract with the Owner, Subcontractor shall be paid the amount due from the Owner for its Work as provided in the Contract Documents, but only after payment therefor has been made by Owner to General Contractor. If General Contractor's contract has not been terminated, Subcontractor shall be paid the reasonable value of Work performed by Subcontractor prior to termination plus reasonable direct close-out costs, but, in no event, shall Subcontractor be entitled to unabsorbed overhead or

anticipatory profit. If no Work has been performed by Subcontractor at the time of termination, Subcontractor shall be paid the sum of $100.00 in full and complete satisfaction for its undertakings and obligations under this Agreement.

**ARTICLE 17:  WORKMANSHIP AND CARE**
A.      Subcontractor shall be responsible for damage to new or existing Work caused by the execution of its Work and shall repair or replace such damaged Work at its own expense.

B.      Subcontractor shall, at all reasonable times, permit inspection by General Contractor or Owner or Architect of the Work and materials provided under this Subcontract, whether at the Project site or at any place where such Work or materials may be in preparation, manufacture, storage, or installation. Subcontractor shall promptly replace or correct any Work or materials which General Contractor or the Owner shall reject as failing to conform to the requirements of the General Contractor of this Subcontract. If Subcontractor does not do so within a reasonable time, General Contractor shall have the right to do so and Subcontractor shall be liable to General Contractor for the cost thereof. If, in the opinion of General Contractor, it is not expedient to correct or replace all or any part of rejected work or materials, then General Contractor, at its option, may deduct from the payments due, or to become due to Subcontractor, such amounts as, in General Contractor's reasonable judgment, represents the difference between the fair value of the rejected work and materials and the value thereof if it had complied with the requirements of the General Contractor of this Subcontract.

C.      Subcontractor's remedy for wrongful rejection of its Work either by Owner or Architect, or by General Contractor acting on Owner's behalf, pursuant to Article 17B, shall be limited to such relief as General Contractor is entitled to receive from Owner under the Contract Documents. General Contractor, however, shall be liable to Subcontractor for any increased direct costs caused by its wrongful rejection of work if the Owner was not involved in said rejection.

D.      Subcontractor's Work shall be accepted in accordance with the terms of the Contract Documents. However, unless otherwise agreed in writing, entrance upon and/or the use of, Subcontractor's Work by the Owner or General Contractor, shall not constitute acceptance of the Work.

**ARTICLE 18:  DEFECTIVE WORK**
A.      Neither the final certificate, nor payment, nor any provision in the Contract or in any other document shall relieve Subcontractor of responsibility for faulty materials or workmanship, and it shall promptly remedy any defects due thereto, and pay for any damage to other Work resulting therefrom. In case Subcontractor fails, upon reasonable written notice, to replace defective materials or perform any labor required hereunder, then General Contractor, or Owner, may furnish such materials or labor, as are necessary to cause the Work to achieve the required standard, and Subcontractor agrees to promptly pay General Contractor or Owner the cost, plus 15% overhead, expended in this behalf.

**ARTICLE 19:  WORK STOPPAGE**
A.      General Contractor may stop the Work whenever such stoppage is ordered by Owner, or its representative, or when, in the reasonable judgment of General Contractor, such stoppage is reasonably necessary to insure the proper execution of the Contract or the Work. In either event, General Contractor shall not be liable to Subcontractor for any additional costs which such work stoppage may cause to Subcontractor except to the extent that it is able to recover such additional cost, on Subcontractor's behalf and at Subcontractor's sole expense, from Owner it being understood that the General Contractor shall use reasonable efforts to recover from the Owner. Additional mobilization and re-mobilization costs may be reimbursed to Subcontractor as allowed by the General Contract.

**ARTICLE 20:  COORDINATION/COOPERATION**
A.      Subcontractor agrees to cooperate with and to otherwise coordinate its Work with the General Contractor and other subcontractors with whose Work that of Subcontractor may come in contact in order to avoid complications, delay to the progress of the Work of Subcontractor or others, and to insure first class workmanship in every respect. In the manufacturing, assembling, erection, installation, and application of the Work, Subcontractor shall employ only men whose work will be acceptable to and in harmony with other workmen on the Project. Subcontractor shall furnish such

skilled and competent workmanship and labor, and unless otherwise specified, such new material as shall be suitable for the performance and the timely completion of its Work hereunder and shall protect said workmanship and materials from damage by the elements or otherwise until completed. Subcontractor shall, at all times during progress of its Work, employ a full-time field superintendent on site, acceptable to General Contractor, who shall supervise and coordinate its Work and act as Subcontractor's agent and representative in order to expedite the Work and insure the highest quality of workmanship.

**ARTICLE 21:    PROJECT HARMONY**

A.      Subcontractor, and its lower tier subcontractors and suppliers, shall not use any labor, materials, or work methods which may, or shall, cause strikes, secondary boycotts, work stoppages or slowdowns, or labor disturbances of any kind or nature to the project. Subcontractor, and its lower tier subcontractors and suppliers, further agree to comply with all labor and laws and work regulations applicable to its Work and to refrain from engaging in any conduct, or in employing any labor, which may, or shall, result in General Contractor being in violation of a provision or provisions of a labor agreement to which it is a party. Upon receipt of written notice from General Contractor that it, or its lower tier subcontractors and/or suppliers, are in violation of any of the above specified prohibitions and requirements, Subcontractor shall immediately cease such violations and, if they are the violations of its lower tier subcontractors and/or suppliers, it shall immediately cause its lower tier subcontractors and suppliers to cease such violations. Subcontractor agrees to defend, indemnify and to hold General Contractor harmless from and against any and all claims, liabilities, losses, and expenses (including but not limited to reasonable attorney's fees) and court costs, of every kind and description which are asserted against General Contractor, or which it may incur or sustain, by reasons of any such violations.

**ARTICLE 22:    SUBMITTALS**

A.      Subcontractor's attention is directed to the applicable provisions of the Contract Documents which describe the required submittals and procedures for submitting shop drawings, setting plans, erection drawings, working diagrams, equipment layouts, samples, and cuts (submittals). Subcontractor shall immediately expedite preparation of a complete and itemized schedule of all materials, equipment, samples, and shop drawings which are required by the Contract Documents. Subcontractor shall prepare a detailed and comprehensive schedule indicating when each item will be submitted to General Contractor. Said schedule shall be prepared to permit adequate time for review and, if necessary, resubmittal in order to avoid any delay to construction progress due to late or untimely submittals. Subcontractor shall obtain the necessary Architect's approval of same without cost to the General Contractor. The approval of all submittals shall be general and shall not mean that they have been checked for accuracy of measurements or figures, and shall not in any way, relieve the Subcontractor from the responsibility for furnishing correct figures, of taking the necessary measurements at the building, of providing proper fitting and construction of its Work, of furnishing materials or labor required by the drawings and specifications which may not be indicated on the shop drawings when approved, and of doing whatever may be reasonably required to make the Work included in this Agreement a complete and workable installation satisfactory for the purpose intended. Subcontractor shall furnish periodic progress reports on the Work, as mutually agreed, including information on the status of materials and equipment which may be in the course of preparation or manufacture.

**ARTICLE 23:    APPROVAL OF SUB-CONTRACTORS**

A.      Subcontractor agrees, as a condition of each PSA, to issue, or cause to be issued, within thirty (30) days after reasonable notice of award of each PSA executed by General Contractor, all purchase orders and subcontracts as may be required for the Work. Prior to commencing performance of its Work, Subcontractor shall obtain General Contractor's written approval of all Subcontractor's sub-contractors and suppliers it intends to use in the performance of its Work. Its failure to do so shall constitute cause for termination pursuant to Article 15 of this Agreement.

**ARTICLE 24:    GOVERNMENTAL COMPLIANCE AND PERMITS**

A.      Subcontractor shall comply with all codes, rules, ordinances, statutes, regulations, and similar requirements of all governmental authorities having or claiming jurisdiction over the performance of the Work and/or of the conditions of employment of any person employed by or for Subcontractor including, but not limited to, all federal, state, county, municipal, and environmental authorities wherever they apply to the Work or materials supplied hereunder. Subcontractor shall procure and pay for all necessary State and local registrations, business licenses, fees and permits

excluding the building permit, permanent or temporary, affecting all or any part of the Work hereunder notwithstanding any contrary provisions in the General Contract or other Contract Documents. Subcontractor shall also give the proper authorities all requisite notices relating to the Work and save General Contractor, Architect, and Owner, and each of them, harmless from all annoyance, delays, fines, or other such costs having reference to the Work hereunder.

**ARTICLE 25:    INFRINGEMENT OF PATENT RIGHTS**

A.      Subcontractor shall indemnify, save harmless and defend, Owner, General Contractor, Architect, and each of them, from and on accounts of all claims, judgements, and decrees involving the infringement of patent rights arising from the performance of the Work or from the use of any patented processes, by Subcontractor or his subcontractors, and it shall pay all costs and expenses, including reasonable attorney's fees, incurred by Owner, General Contractor, Architect, and each of them, in defense of suits for the infringement of patent rights.

**ARTICLE 26:    CONTRACT REFRAINMENT**

A.      Subcontractor agrees to refrain from entering into any contract or agreement with Owner in regard to extras, omissions or changes in connection with the Work embraced by this Agreement but will deal solely with General Contractor in reference thereto. Any violation of this Article shall make Subcontractor liable to General Contractor for 10% of the amount of the agreed price for such extras or of the value of such omissions or changes, which 10% may be deducted by General Contractor from any balance that is due Subcontractor hereunder. In the event no such balance is due, Subcontractor shall promptly pay General Contractor such amount.

**ARTICLE 27:    MISCELLANEOUS PROVISIONS**

A.      Subcontractor shall furnish and install all inserts and anchors required for the proper securing support and erection of its Work, attachments and miscellaneous materials and shall perform all layout Work, take necessary field measurements, and provide all scaffolding required to perform the Work under this Agreement.

B.      Notwithstanding anything to the contrary in the Contract Documents, Subcontractor agrees to be and is fully responsible for all hoisting required for its Work.

C.      Subcontractor shall be and is fully responsible for protection and condition of its materials, Work or equipment installed or stored on Job Site or elsewhere until final acceptance thereof by Owner and Architect, and further agrees that General Contractor is not obligated to and will not carry any insurance for benefit of Subcontractor.  The Subcontractor materials stored onsite; Work installed may be covered under the Project's Builders Risk policy in accordance with the Contract Documents.

D.      Temporary electrical service will be provided for use by the Subcontractor. The service will consist of a 110-volt distribution system of convenience outlets and lighting. If Subcontractor requires any additional electrical requirements above the 110-service, Subcontractor shall be responsible and pay all costs for the wiring installation and the energy consumption of said additional electrical requirements.

E.      Items of this Agreement stated in the male gender shall be deemed to refer to the female, and in the singular to the plural and vice versa, when necessary to implement the purposes of this Agreement. All stenographic and clerical errors are subject to correction.

F.      Subcontractor shall, on an annual basis, comply with General Contractor's prequalification program.

G.      General Contractor may establish a procedure by which documents may be signed by the parties using an electronic signature methodology designated by General Contractor in its sole discretion. Such electronic signature methodology will be considered binding and may be relied upon by General Contractor and Subcontractor.

H.      This Agreement may only be amended by written agreement of the parties hereto.

**ARTICLE 28:    USE OF EQUIPMENT**

A.       If, at any time during construction of Work covered by the Agreement, the Subcontractor, its agents, employees or suppliers should, either with or without permission of General Contractor, use any tools, appliances, hoists, elevators, scaffolding, ladders, falsework, shoring, materials, machinery or equipment which belong to or are furnished by General Contractor, Subcontractor assumes full responsibility for any injury to person or property which may result from or in connection with use of any such tools, appliances, hoists, elevators, scaffolding, ladders, falsework, shoring, materials, machinery or equipment by Subcontractor, its agents, employees or suppliers and agrees to Indemnify, defend and hold harmless General Contractor, Owner and Architect against loss, liability, costs, expense and reasonable attorney's fees from such claims except to the extent that they are caused solely by the negligence of General Contractor, Architect and/or Owner, whichever the case may be.

**ARTICLE 29:    CLEAN UP**

A.       Except as otherwise provided in a PSA, Subcontractor shall perform regular cleanup and prompt removal from Job Site and adjacent roadways of all dirt, mud, excessive dust, and debris resulting from Subcontractor's Work performed under the Agreement notwithstanding any reference in the Contract Documents requiring General Contractor to perform said cleanup or rubbish removal. In cleaning or utilizing adjacent roadways, Subcontractor shall, at no cost to General contractor, provide flagman to the extent that General Contractor determines they are required. In the event Subcontractor fails to perform regular cleanup and prompt removal from the Job site, General Contractor shall perform said cleanup on Subcontractor's behalf and charge Subcontractor for the cost thereof. If a general cleanup of the Project is required on behalf of all subcontractors which either are working, or recently have worked, at the Job Site, General Contractor shall notify the Subcontractor of required cleanup, if the cleanup is not performed within forty eight (48) hours of such written notice, the General Contractor shall perform said cleanup and charge the cost thereof to said subcontractors on a prorated basis using its sole discretion to determine the basis for the prorated charge. Upon completion of the cleanup, Subcontractor will be notified in writing within a reasonable time period, as to the costs expended in its behalf. If Subcontractor disagrees with such charge, it may pursue its remedies under Article 14 of this Agreement.

**ARTICLE 30:    SAFETY**

A.       Subcontractor shall, at its own expense, conform to the basic safety policy of the General Contractor [see Subcontractor Site Safety Requirements and Procedures which is part of each PSA and comply with all specific safety requirements promulgated by any governmental authority including without limitation the requirements of the Occupational Safety and Health Act of 1970 and the Construction Safety Act of 1969 and all amendments thereto and all standards and regulations which have been or shall be promulgated by the parties or agencies which administer such Acts. Subcontractor also shall require full compliance with such requirements by its agents, employees, materialmen, and subcontractors (both generally and, in particular, with respect to its portion of the Work on this Project) and shall respond to, defend and be responsible for all citations, assessments, fines or penalties which may be incurred by reason of its failure, or failure on the part of its agents, employees, materialmen or subcontractors, to so comply.

**ARTICLE 31:    SITE SAFETY & SUBSTANCE ABUSE**

A.       Subcontractor shall accept General Contractor's, and the Project's, Substance Abuse Policy, the more stringent policy shall take precedent, which is contained in Subcontractor Site Safety Requirements and Procedures or a substantially similar policy for its own employees, agents and representatives who come onto the Project and shall require its subcontractors and suppliers of any tier who come onto the Project to do likewise.

B.       If Subcontractor, or anyone who comes onto the Job Site under an employment or a direct or indirect contractual arrangement with Subcontractor, fails to enforce General Contractor's Subcontractor Site Safety Requirements and Procedures or a substantially similar policy, General Contractor reserves the right to bar such party from the Job Site. Any resulting damage (including damage for delay) will be the responsibility of Subcontractor.

C.       Copies of General Contractor's Subcontractor Site Safety Requirements and Procedures shall be made available to Subcontractor upon request.

**ARTICLE 32:    SUBCONTRACTOR LABOR**

A.      Subcontractor covenants and agrees that any and all labor employed by its subcontractors and it, in the performance of its Work hereunder, will be paid fully for strictly in accordance with all applicable federal and state laws and in accordance with applicable, if any, union agreements and that it will, upon demand of General Contractor, furnish evidence satisfactory to General Contractor that its subcontractors and it are so doing. In the event that General Contractor shall become liable for any costs resulting from Subcontractor, or its subcontractors' failure to comply with this provision, Subcontractor shall immediately, upon demand, reimburse General Contractor for said costs. To the extent required by the General Contract, Subcontractor shall permit General Contractor to reasonably examine its payroll books and records relating to the Project and shall cause its subcontractors to permit General Contractor to examine their payroll books and records relating to the Project. Such examinations shall be permitted, upon reasonable written notice, at the offices of Subcontractor or its subcontractors, during their ordinary business hours.

**ARTICLE 33:    EQUAL OPPORTUNITY**

A.      In connection with the performance of Work under this Agreement, Subcontractor agrees not to discriminate against any employee or applicant for employment because of race, religion, sex, color, national origin or disability protected by the Americans with Disabilities Act. The aforesaid provision shall include, but not be limited to Chapter 60 Equal Employment Opportunity Title 41, Part 60-1.4 (1-7) and Executive Order 11246, as amended, Vietnam Veterans Readjustment Assistance Act of 1974, as amended 38 U.S.C. 4212 and the Rehabilitation Act of 1973, as amended and the following: employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rate of pay or other forms of compensation and selection for training, including apprenticeship. Subcontractor agrees to hereafter post, in conspicuous places, available for inspection by Subcontractor's employees and applicants for employment, a notice which sets forth its obligations under this Article, along with any other Equal Employment notice which it is required to post by federal or state statue, law or regulation.

B.      Subcontractor shall permit reasonable access to its payroll books, records, accounts relating to the Project by representatives of General Contractor or the Owner for purposes of investigation to ascertain compliance with provisions of this Article 33.

C.      In the event of Subcontractor's non-compliance with the equal opportunity provisions of this Subcontract, this Subcontract may be terminated for default.

D.      Subcontractor shall include the provisions of this Article 33 in Subcontractor's subcontracts. The requirements of this Article 33 shall be in addition to any Equal Opportunity provisions of the Contract Documents.

**ARTICLE 34:    ADDITIONAL INFORMATION**

A.      In addition to the information to be provided by Subcontractor pursuant to other provisions of this Agreement, Subcontractor hereby agrees to provide, at no additional cost to General Contractor, and in a prompt and timely fashion so as not to disrupt the performance of this Agreement or the contract between General Contractor and the Owner, any and all additional information relating to this Subcontract which is required either by the Contract Documents or by the applicable State laws.

**ARTICLE 35:    WARRANTIES AND GUARANTEES**

A.      Subcontractor shall furnish to General Contractor, any and all separate written guarantees, warranties and/or maintenance agreements which General Contractor is required under the General Contract to furnish to Owner, including, but not limited to labor, materials, machinery and/or equipment guarantees and warranties, which Subcontractor is required to furnish under this Agreement and the Contract Documents. Said written guarantees, warranties and/or maintenance agreements shall be furnished to the same extent and at the same time as General Contractor is required to furnish them to Owner by the General Contract, and they shall run in favor of General Contractor, Owner and every other person, firm and corporation to whom General Contractor is required to furnish such protection under the terms of the General Contract and the Contract Documents. Subcontractor's obligation hereunder shall include an obligation to furnish any and all guarantees, warranties, and/or maintenance agreements which are required by the Contract Documents of its subcontractors and suppliers.

## ARTICLE 36: GOVERNING LAW

A.      This Agreement shall be governed by the laws in effect in the State where the Project is located.  Any provision of this Agreement prohibited by law, or invalid under any law, shall be ineffective only to the extent of such prohibition, and such invalidity shall not, in any manner, invalidate or affect the remaining provisions of the Agreement, such provisions being deemed severable.  The failure of either party hereto to insist, in any one or more instances, upon the performance of one of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects such further performance.

## ARTICLE 37: ASSIGNMENT

A.      Subcontractor shall not assign the Agreement in whole or in part or any monies due or to become due hereunder without the previous written consent of General Contractor, and any such attempted assignment without the consent of the General Contractor shall be void and the assignees in such case shall acquire no rights in such subcontract.  General Contractor may assign the Agreement in whole or in part hereunder to others upon written notice and approval from Subcontractor, such approval shall not be unreasonably withheld.

B.      Subcontractor, by execution of this Agreement, contingently assigns to General Contractor all Subcontractor's subcontracts. The assignment of each of Subcontractor's subcontracts shall take effect only upon Subcontractor's termination for default under Article 15 and General Contractor's affirmative acceptance of the assignment of the specific subcontract by written notice to Subcontractor and Subcontractor's subcontractors.  General Contractor shall have no liability to any of Subcontractor's subcontractors unless and until General Contractor affirmatively accepts the assignment as provided above.

## ARTICLE 38: NOTICES

A.      All notices, requests, demands, and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by Federal Express (or other overnight courier) or by electronic media ("email"). If such notice is given by email, it shall only be effective if a copy of it also is simultaneously mailed to the addressee by first class mail, postage prepaid. All such notices requests, demands, and other communications shall be deemed to have been given on the date of personal delivery or, if given by Federal Express (or other overnight courier) or by email, on the first business day after the delivery of the transmission thereof, or if given by mail on the second business day after posting.

>    **For General Contractor send to:**      Mr. Jeff Geier, President and CEO
>                                             Power Construction Company, LLC
>                                             8750 W. Bryn Mawr, Ste 500
>                                             Chicago, IL 60631-3546

**The parties acknowledge and agree that (i) from time to time the parties may execute by way of electronic signature, (ii) such electronic signatures are sufficient to bind the party who purports to so execute by way of electronic signature, and (iii) each party shall be entitled to rely on the electronic signature of the other party.**

**Joys Union Clean Up Services LLC**                    **POWER CONSTRUCTION COMPANY, LLC**

Signed by:                                              DocuSigned by:

*Armando Calderon*                                      *Patrick Duggan*
— 528D9FAC7B3F4BF...                                    — 7427597DEC1A4CE...

Name                                                    Name